Are all of the attorneys here that are going to argue that case? Yes. Is it scheduled for 10 minutes from now? Can we proceed now? Yes. Can we? Please approach. Call the next case please. The attorneys who will argue, would you please approach the bench and introduce yourself to the court. May I please report, Terrence Dendon of Trapecus and Trapecus on behalf of Robert Purcell, the personal administrator of Ronald Larson, the plaintiff and appellant in the matter. Bethune. Bethune, your honors. Anthony Phelps, brought from Reno and Zon for the appellate Camille Calkins. She's a defendant. 15 minutes each. 10 and 5 for the appellant. That would be, yes. Reserving 5 for rebuttal, your honor. Thank you, your honor. The appellant, please proceed. Keep your voice up because the microphone in front of you is there for recording purposes only. If you want your voice to be heard by everyone in the room, it's not an amplifier, so please keep your voice up. Please proceed. May it please the court, as I've stated, my name is Terrence Dendon. I am the attorney for Robert Purcell, who is the personal representative of Ronald E. Larson, the original plaintiff in this matter. Mr. Larson and the defendant, Ms. Calkins, are siblings, and this concerns the estate planning and administration of their parents, Wilbur Larson and Cecilia Larson. This matter also pertains to two separate appeals of motion for summary judgment orders. The first appeal filed before this court was on three of nine counts, but the order granting summary judgment came after the first appeal, which was six of nine counts. We humbly request the court reverse the rulings of the lower court on motion for summary judgment for both appeals. This matter concerns the defendant, Camille Calkins' interference with the estate planning of her mother at a time where the record reflects her mother was suffering from diminished capacity in an effort to disinherit her brother, Ronald Larson, in favor of her own children. Ronald Larson lived with his mother, Cecilia, for approximately 30 years, when in 2007 Camille came from Arizona, where she had resided, to execute a durable power of attorney with her mother before Attorney Lyman Welch. Lyman Welch prepared this durable power of attorney for property, making Camille the daughter of the attorney-in-fact upon execution. Beginning on this date, from August of 2007 through December of 2007, in a series of emails, Mr. Welch prepared drafts at the direction of Camille Calkins. He sent drafts of a purported 2007 restatement of trust to Camille. This, according to Camille's arguments, would have been in direct contradiction to a 30-plus-year estate plan in place for Cecilia Larson and her husband Wilbur Larson. Under those estate plans that began in 1981 with first complementary wills and then complementary trusts in 1991, the residue of the trust estates would go to the spouse up to the murder exclusion, after which the two children, Ronald and Camille, would be entitled to 50% of the residue upon the death of the surviving spouse. Mr. Wilbur Larson passed away on November 23, 2000. From November 23, 2000 until August of 2007, no change had been made to Cecilia's estate. She had intended that, upon her death, 50% would go to her daughter and 50% to her son. Beginning in August, Camille began communicating with Lyman Welch after she executed this durable power of attorney, creating a fiduciary relationship with her mother, in which she controlled the finances of her mother. Ostensibly, she was... There's no issue raised as to the power of attorney separately? No, there's no issue raised to the power of attorney separately. It is whether the power of attorney created a fiduciary relationship and a relationship of trust and dependence upon which her lives depended. Overly influenced her mother. Correct, and as a legal matter, the trial court determined that, even though the power of attorney was executory on execution and became active, that she was not, in fact, an attorney in fact, which is contrary to the documents themselves. From this time, Camille communicated with Mr. Welch via email, back and forth, directing not that her mother wanted these changes, she was directing I, or we, want these changes input into the document. This was all done from Arizona. The attorney, Mr. Welch, doesn't agree with that. Mr. Welch states that he was sending them to Camille so that Camille could go over them with her mother, strictly for that purpose. Sending a copy to Camille. Sending Camille the copies. He said he does not, there is no documentary proof, despite numerous communications in the files of Mr. Welch, there is no documentary proof that he ever sent any copies to Cecilia herself. In fact, a number of billing entries in Mr. Welch's billing records are billed communications directly with Camille. The August 20, 2007 letter and the September 18, 2007 letter are sent to Cecilia. They do copy Camille, I'll give you that, but they were sent directly to Cecilia. In August, correct? August and September. Yes. And then in October and November, Camille communicated exclusively via email, stating these are my children's names, these are their birthdates, these are my grandchildren's names. Please change this. Please change this. This provision. We have decided she makes these terms in these emails that state that she's making these decisions. Now, contrary to the statements of Mr. Welch, stating that he was only sending them to Camille so she could go over them with her mother, Camille in her deposition states, I never went over them with my mother. I never read them to her. Mr. Welch himself admits that he never read a copy of the entire document to Ms. Larson at any time. The involvement of Camille during this time is a question of fact, I believe for a trier of fact to hear. The emails back and forth, as circumstantial as they may be, it's circumstantial evidence is sufficient to provide for a finding of undue influence. Additionally, when Ms. Calkins, the daughter, returns in December of 2007, she goes with her mother via train from Pallet Town down to the office of Mr. Welch in order to execute these documents. Again, Mr. Welch does not go over them with Cecilia. The records of Mr. Welch indicate... But doesn't Mr. Welch say he went over them with Cecilia? He does not. He says that he went over certain areas. One of the areas that he claims to have gone over, which is the major change, as he puts it, would have been the dispositive provisions. That is that it is that very provision that no one notices what they term a scrivener's error and which is not merely a common misplaced, it is a major dispositive provision change from a 30-plus year estate claim. It's not a simple matter. So it is, as it may be circumstantial, not catching such an error. Talk a little bit about that change. Because you're saying it's a major dispositive. Really, it has to do with distribution, right? Ten percent a year rather than the entire amount? Sure. And then what happens upon the death of the beneficiaries? According to the defendant's interpretation of that language. The plain reading would direct you to certain articles in that document, which right on their face does not, in fact, change the distribution pattern. But under their theory, the distribution would go 10 percent to each child, after which it would go to the descendants in whole. So this changes a 50 percent entitlement to the entirety of the residue to a mere 10 percent of one-half of that residue. So it only matters if somebody doesn't live at least five years. If someone doesn't live ten years. In this case, as a matter of fact, Ronald died approximately two years later. And he had no kids. He had no kids, a fact known to Camille and known to Cecilia. I'm a little confused on your position on the Scribner's error. Is your position on the Scribner's error that the new documents, 2007 documents, don't say what the defendant says they say? Or is your position that they're just makes it unenforceable because they are? It's a dual position, Lana. What our position is is that read as is on the plain meaning without imputing any additional. Because if you recall from the pleadings in which you will see as you read the briefs, a sophisticated trust company refused to honor that agreement, that restatement. As written, pointing to certain provisions and articles of those trusts of the restatement, it doesn't change anything. It refers to Article 6. The position of the defendant is that it should have referred to Article 4. Right. But Article 6 is a postponement of possession provision, which on its face is not against any of the language in the trust up to that point. It would make sense as written for someone to read that and say, half to each child pursuant to Article 6. Turning to Article 6, it says postponement of possession. After reading that, it would read, well, Ronald's not subject to this postponement of possession. I am not going to read that. I am not going to read that. But as defendant has argued, their reading would make the document incomprehensible, especially in that of the circumstances. And when determining whether the construction of a trust agreement, similar to that of a will, there is consideration for the age of the testator, the size of the estate, many different factors, none of which were considered by the trial court in ruling and determining summary judgment in favor of the defendants. That brings us to the next big issue. The first is the level of involvement of Camille, the daughter, in the estate planning between August, when she had a durable power of attorney, and December. The second major issue with that, the six of nine count appeal, is that Cecilia was suffering from diminished capacity at that time. There are two main documents relied upon in the record which establish that. The only counter evidence to that is Camille, the daughter's own position, a position which she herself is not clear on and is contradictory. Camille, sorry. Well, but when you say in the record the court said that she did not consider the, is it Patras? Yes. The Dr. Patras affidavit. And the other one you were talking about was the psychologist, Amber. Amber Atkins. Amber Atkins. Those were the two you were talking about. Right. So because she didn't consider it, I mean, I guess it's in the record, but it is in the record. She considered one and not the other. She considered the Atkins report, and she, we believe, unjustly weighed that report. It was a fact that should have been presented to the trier of fact to weigh in addition to all the other evidence. So you're saying that it was too far apart, her examination was too far apart from the time of the execution and will, is that correct? Correct, and what the court, the cases that the court relied upon involve an occupational therapist rendering an opinion as to the mental state of someone going through therapy three to four months after the events. That case was also heard at a trial and was presented to the trier of facts, as opposed to this, which was heard on summary judgment. Additionally, the court, in rendering its decision, stated that she, the Atkins report, which was, has not been challenged on foundational bases or any other basis, was also included in defendant's brief and response. At the trial court level. Yeah. That report comes nine and a half weeks after the execution. It doesn't come, as the court states in its opinion, four to five months after. That is a significant discrepancy in time. When rendering the opinion, the court says, because it came four to five months later, it is not conclusive as to her state. That is an unjust weighing of the evidence at the summary judgment phase. But additionally, the diagnoses in that report are of such a nature that it wouldn't, are very specific as to the conditions. That she cannot, she has no control over her personal finances, over her personal decision making. She does not possess the capacity to make those decisions. Additionally, the nature of her illness, diagnosed by this clinical neuropsychologist, is that her condition is such that it would be masked in a home or familiar environment. Ms. Calkins, the only testimony provided contrary is contradictory. Ms. Calkins at once states in her answer to the third amended complaint and in her answer to interrogatories, we admit that Cecilia suffered from dementia as of 2009. In her deposition, she states, my mother never suffered from dementia until the day she died. She was sharp as an arrow. I may be paraphrasing, but she does use something along those lines. In this case, her own testimony, there is a question of fact as to the start and onset of the dementia. So if the defendant's own position contains questions of fact as to the capacity, this report prepared nine and a half weeks after the execution of the documents for the purposes of rendering an opinion on the capacity of Cecilia and making very specific, detailed notes should not have been weighed by the court and it should not have been disregarded as temporarily unrelated. As a matter of course, this court, counsel has attacked the reference of certain case laws coming from the early 1900s. That's because the case law hasn't changed. This court has never rendered an opinion on a strict guideline as to how long after the execution of a document, evidence of incapacity can be considered. It's supposed to be considered in the circumstances and along with all the other evidence. Given the nature of these ailments, it is conceivable that a trial of fact would weigh this and state that is of such a nature that the incapacity was more likely than not took place in December of 2007, especially given her mass. Three more minutes, if you want me, Paul. Thank you, Your Honor. I will use a minute to two minutes real quick. As to Professor Patrick's affidavit, it was improperly considered a report, as in a 213F report. The court references it as a report and refuses to consider it. The appropriate time for filing an affidavit is at the hearing or prior to the hearing on a motion for summary judgment, a counter affidavit, and it was filed properly. 213F disclosure was never closed. The trial court references 191B in denying the motion, saying he was not disposed pursuant to 191B. 191B is for an affiant who is unavailable. This affiant was available. The trial court did not even consider his report. That is improper under this court's rules and under 2-1005 summary judgment rules. Every affidavit on record should have been considered. It was not considered. It wasn't even considered as a sworn, a duly sworn affidavit. As regards the 191A challenge, which for the first time appears in counsel's response brief to this appellate court, the Amber Evans report, which had no foundational challenge at any point in the trial court proceedings, was attached to the affidavit. It was filed contemporaneously with that affidavit. As such, if anything was improper in that affidavit, which quotes that report as a basis for opinions, those other sections should have been stricken, and the remainder of the affidavit dealing with the Amber Evans report should have been considered, none of which was considered. Your Honor, I reserve one minute for rebuttal, if one minute's sold. We'll give you three for rebuttal. Thank you, Your Honor. Please be seated. Appellate. Thank you, Your Honor. May it please the court, Anthony Phelps for the defendant, an appellate, Camille C. Calkins. Your Honor, I know there's a number of issues involved in this case. Obviously, as counsel had discussed, I think addressing them, the case really boils down to, this case was about a misinterpretation of a construction of the document. And all these different claims that have proceeded and that were added as the complaint grew, as different versions of it were amended at the trial court level, has continued on with this misperception. No matter what Camille did in this case, no matter what they allege, Camille is not a trustee. Camille shouldn't be a trustee based on the trusts that are presented to the court. All the evidence that's presented in terms of the unrebutted testimony of both Camille as well as Lyman's, all Camille was was the ability to help her mother. She communicated with an attorney. It's never been found in any court to be itself alone enough to find a document to be invalid for undue influence. The heart of the matter really is that Camille held and has preserved some estate assets. They've misconstrued the terms of the document in an attempt to coerce her to make a distribution of those when that very issue has been before the trial court and they've been litigating it. They're attempting to make Camille distribute something that she never had the requirement or responsibility to do in the first place. They're misconstruing those documents in an attempt to gain more than what her mother intended. This case, Your Honor, has been going since 2013. Cecilia passed away now in 2012, Ronald Larson in 2014. My client, Camille Calkins, is in her mid-70s and she still hasn't received her distribution from the trusted issue. All the witnesses who have had interactions with Cecilia in this case, Camille Lyman Welch, Cecilia's attorney of 30 years, have given their testimony. There's no other testimony that's been provided. Camille's also given volumes of discovery. She's given her affidavit. She's sat for her deposition. When we go through, Camille has stated under oath that she's provided all of the financial information that she has for these trusts. There's nothing more that she could provide to Ron. Well, isn't there an issue, though, as to her mother's competency at the time these changes, which are significant, were made? Thank you, Your Honor. The appellant has attempted to raise an issue here on appeal regarding that. Well, it tried to in the trial court, too, and the trial court said, I'm not going to pay any attention to those affidavits. Right. So the affidavit, I'll jump to the affidavits, Your Honor. Dr. Patras was an affidavit that the appellant relied upon at the trial court level. Dr. Patras' affidavit was properly excluded by the trial court for three reasons. The first was that under Supreme Court Rule 191A, under the Supreme Court opinion in World War, the court found that the failure to attach an affidavit is fatal. It's a requirement under, excuse me, not affidavit, to attach the, yes, the documents, the sworn and certified copies of documents. But didn't, wasn't the report of, I forget Adkins, was that attached? It was not attached to the affidavit. It was an exhibit to the response to the motion for summary judgment that counts as filed. Right, but filed with the affidavit. Filed with, yes. And the affidavit referred to it on a number of occasions as being the basis for the affidavit. It did. And it also referred to what they called medical records from InterCare, Northwest Health, whatever those may be. Well, what about his argument that you just don't consider that part of it? Yeah. I don't think, there's no case that he cited that relates to, shows the failure to attach documents to somehow a court bifurcating what part of the affidavit related to the documents that were referenced and the documents that weren't attached. Well, we do bifurcate 191 affidavits all the time, right? We'll say we'll consider these paragraphs and not those paragraphs. Sure. And we don't know what paragraphs in which they were related to Adkins. We don't know what were paragraphs related to Medicare. We don't know what paragraphs related to Northwest Health. There were, Your Honor, cases that were cited. There was Lou Casey. There was a case that we cited in our brief that stated that regardless of whether or not the records were publicly available or otherwise available or disclosed during discovery, it still was fatal that they weren't attached. Our first district here has adopted the Webber-Doan file, Webber-Doan in the Prez v. Borden chemical case. In that case, you found that it was fatal because that documents upon which the affidavit based their opinion were not attached to the affidavit. Sworn and certified copies. Remember, the Adkins report is merely a document that they, I don't know where it came through discovery from them. They got it from the facility where that was located. It's not an affidavit of Adkins. It's merely a copy of a document that they've attached to a motion for summary judgment. I've not seen any case, and they have not cited any case, that that somehow complies with Borden's affidavit. You're saying that Dr. Patras didn't have a right to rely on that document? We don't know what Dr. Patras relied upon, other than they included it in the affidavit. Well, but he said in the affidavit that that was the basis for his claims. Right. The reason for it is they want to make sure that, and what I understand their role is they want to make sure that the affidavit is based upon evidence that could be admitted at trial. And what it's based on, that's why they require sworn and certified copies of the documents attached. What this is, again, it wasn't attached to the affidavit. It was attached to a motion, and it was merely a copy of a medical record from Ms. Adkins. But there was no motion to strike the affidavit. You raised it in your reply. They filed it, yes. They filed it in their response. We raised it in our reply to contrast their ability to be able to attach it. In addition to the 191, Your Honor, there's the issue that it was untimely. Can you explain that? Yes. We filed our motion for summary judgment. The motion was to obtain a 90-day discovery of the affidavit, and the trial court granted that after some motions back and forth. Ultimately, the court entered a 90-day discovery window for the parties to conduct their discovery as it relates to the motion for summary judgment. That's what the order said. Okay. Did that require a specific disclosure of experts? Did you have any derogatory on experts? No. Thank you, Your Honor. During that 90-day discovery window, our office, we submitted an interrogatory to counsel for appellant that included a 213-F interrogatory regarding disclosure of witnesses they intended to testify. And neither of these doctors were disclosed in response? To the Amber Adkins report, they were attempting to track down Amber Adkins. That was one of the reasons we understood they wanted the additional discovery. But Dr. Patras was omitted from it, not included. But you didn't file a 191-B after they filed that after David to take his deposition or to get further discovery with regard to Dr. Patras? I did not. All I did, Your Honor, is we checked the timing of it, and I think that the way the trial court looked at it is the trial court entered that order, the 90-day disclosure order. And the way the trial court looked at it in summary judgment, what I understand, was that they looked at it as she set a deadline in which that discovery was supposed to be concluded. We submitted an interrogatory specifically asking for the information, and he was not included. In the timing of it, I made some effort in my brief to try to portray the timing of the disclosure as well, where it appears as though that Patras' affidavit comes after attempts to get more time. I think it was the week or so before the brief was due. The Patras' affidavit appeared two days before the final of the brief was filed, not disclosed under the 213, even though we asked for it. Do you have a third reason? What's your third reason? Thank you, Your Honor. In addition, our argument at the trial court level was that the Patras' affidavit was speculative, that the expert tests were maintained to be done by information they can testify regarding their experience and qualification, how it would be helpful to the trial court. What the Patras' affidavit says internally, if the trial court were to have considered it, we made these arguments at the trial court, were to consider it was that it wasn't based upon the opinion of any facts relevant to the time period at issue. So to break that down, the Adkins report was prepared in February, about approximately February 18th of 2008, which was a month and a half, or two months after the estate plan at issue, almost two months, a month or so after the decedent fell in her home. So she was doing, excuse me, she was undergoing some therapy at Manor Care, and that's when that affidavit was prepared. So the position was, Your Honor, is that it was speculating, the affidavit was based upon information itself, which wasn't at all related to the December 4th, 2007 date when the estate plan was executed. And it also, excuse me, the affidavit also refers internally to Manor Care, Northwest Health, and some other records which are clear from the record on appeal that the decedent didn't receive health care from those institutions around December 4th, 2007 either. They were from months later. Would that go to the weight versus sufficiency? I don't think so, Your Honor. I think it goes to the sufficiency of the affidavit itself. In addition to the Petras affidavit, the Adkins report, the trial court found that to be, the trial court noted that, remember, there's two separate appeals in this case. There was a December of 2016 order and a September of 2017 order. In the, specifically noted in the 2017 written opinion that the trial court made, she included there that, footnote, I believe that the Adkins report isn't something that she could consider, not the type of evidence she could consider. And I believe that the reason for that was that, one, it was merely a document attached. It wasn't an affidavit from Amber Adkins. We don't have deposition testimony from Amber Adkins. We just merely have a report attached. In addition, it only shows a snapshot of what the decedent's condition could have been like on February 18th, 2008. It makes no opinion at all about what it was like on December 4th, 2007. It makes no conclusions about any of the underlying background, underlying elements about testimony capacity because it was prepared for another reason. It was prepared for discharge at a facility where she was living once after. So your understanding of the record is that she did not really consider either of these reports? My understanding is that. I'm sorry, the affidavit or the report. I believe that the report was considered by the trial court from the oral ruling that we had. Okay. But then she dropped a footnote saying she didn't consider it? That's what I'm confused about. Yeah, that's what I think she did in the September order. Okay. And her first ruling makes it look like she did consider it. She did, yeah. And then later she says, I actually didn't consider it. Yeah, yeah. That's what I immediately. Okay. That's why I was confused. Yeah. And separately, Your Honor, we made the argument at the trial court level, there was a Wrigley case that we'd cited, and that was the case upon which the trial court based our determination, was that in that case there were dependent attempts to minimize the value, because it was an occupational therapist as opposed to a psychologist. It was about the proximity, and it was about the familiarity, is what Wrigley was about. And in Wrigley, the occupational therapist began, had a weekly meeting, or excuse me, it was a monthly visits with the decedent in which they give therapy, and that began two to three months after the state plan documents were executed. We likened that to the Ag Kim's report, which was also prepared two to three months after Cecilia's estate plan documents were executed, and it was based on just one event. So it was even more or less familiar. How many months did you just say? Two to three months in both cases. In addition, so if we were to, what's minimized by the appellant in the case, obviously, is the event. I'm sorry, and this is a small, but it is actually, as your opposing counsel says, it's actually about six weeks, is it not? The end of December to the middle of February. That's what we're talking about. It was December 4th. Oh, it was December 4th, and it was later in December. We believe that Cecilia fell down around December 29th. That's why that date was made. Okay. All right. I knew something happened around this. In addition, as to undue influence, there are some statements as it relates to undue influence. The focus should be on undue influence as the influence has to be such that it needs to destroy a tester's freedom concerning their disposition of the estate, not just some involvement. Although there's significant, I guess, argument regarding Cecilia Camille communicating with Attorney Lyman Welch. We cited a few cases in our brief, the Welch case, the Lemke case, in which both cases, of course, decided as a matter of law that it wasn't undue influence, even though there was some attorney communication with a family member. In addition, I cite in my brief Osborne, which is a summary judgment case in which I made great argument at the trial court level with the idea that the attorney in that case provided a lot of insulation between the family member and the decedent. He reviewed it repeatedly with the decedent to make sure that he understood that she understood and that she was making the decision on her own volition. In this case, Attorney Lyman Welch, it's under the bed of testimony that Lyman reviewed this with Cecilia over the telephone repeatedly. He said that he did, and there's no testimony to rebut that he did. We know that he sent letters to Cecilia about what she asked him to prepare. We understand from Welch's testimony that it was Cecilia that initiated the estate planning by calling him and telling him that she had a concern for Ronald, and he recommended this unit trust format to provide for the percentage payments to address that concern. The communications that Welch continued to have with his client by phone are unrebutted. It's also clear from the letters, if we were to go through the emails and the letters, you'll see that the initial ones were done, I think Camille, I believe, communicated one of the initial letters. And Welch says in response, let's put all these in writing, or I think we have these in writing so that it can all be reviewed with Cecilia. And that's what Welch claims to have done. That's what he's testified to have done. Can we talk just a little bit about the genesis of this thing? According to Mr. Welch's affidavit, paragraph 5, Mr. Larson, the deceased, gave Cecilia a testamentary power of appointment over the family trust, which she exercised upon her death by her will to terminate the family trust and distribute its assets to the children's trust. But her will was never admitted into probate. Well, there was cross petitions. This is a consolidated case to honor the probate case in the Chancery case. There were cross petitions filed by our client and either it was Ron or Mr. Purcell, I'm not certain given the timing, but there were cross petitions to admit the will to probate in that it never had been admitted. It's been disputed. The plaintiff attempts to now portray as part of the brief that the will was never somehow a part of the case. It was never a part of their complaint. I tabbed just for myself as I went through that all the sections of the brief where they talk about the will. I tabbed for myself count four where they're asked to construe the Larson Family Trust as if the will doesn't exist. I tabbed. The position is that it doesn't exist because she didn't have appropriate testamentary capacity. Sure. They also argue that she didn't have capacity. That's therefore it should be invalidated. This should be invalidated because of undue influence. It was before the court. But was it admitted to probate? It was not. There were cross petitions to admit it, but it was not admitted. Why would they have a petition? Yeah, there was a petition filed to admit it, cross petitions. Okay. Yeah. Because the will, I mean, that gets the witnesses saying that it's sound mind and memory. Right. Which is to the issue of capacity again. Right, right. And ultimately the will itself wasn't, you know, it was a power of appointment that was being exercised. I cited some case law in my brief that just because a power of appointment is included in a will doesn't require that the will be admitted to probate. The power of appointment is a direction from the, I guess, the appointee, the person who exercises the power of appointment directing the grantor trust or the trustee to distribute trust assets to the appointee at the end. Right. So ultimately it never becomes part of the estate. There's no reason to probate the estate just because it's a trust. Yeah, it just goes through the trust. Doesn't the will have to be authenticated to give rise? I mean, the power of appointment in this case could be during life, no issue. Could have been, yeah. But according to Mr. Welch, it took place at the time of death based on the will. Well, I think doesn't the will need to be authenticated? So the trustee has the ability to determine what it wants to. It's a risk analysis for a trustee. Appellant has relied on some language from the, I think, administrative procedures from the trust itself that say that the will may be admitted to probate or the trustee may rely on a will admitted to probate. That was later incorporated in a statute that makes clear that it's a cover, it's not a cover. It's a justification for the trustee. It gives trustees some protection to choose to rely on a will admitted to probate, but it's not a requirement that a trustee do so. And then if I skip the next issue, I believe that was addressed by counsel, was the week called the Scrivener's Error in our document, which Welch called the Scrivener's Error. Welch had provided, and I think this is clear through both Welch's, I think his August or September letters about the documents, as well as Welch's subsequent, excuse me, preparation of the trust construction agreement, Welch's affidavit, and then Welch's testimony, all continually repeating his position that there was a Scrivener's Error in Article III. And if your answer to this is I don't know, that's fine. But what are we to make of the fact that this was the big change in all the documents and somehow this pretty significant Scrivener's Error occurred? Are we, is there an explanation for this in the record that I didn't see? I think that Welch was a very, I think that he, he never pointed fingers anywhere else, and I believe he had some staff that was helping him prepare it. This is just me, again, I don't, this is me, I don't know, I believe that's what it was. But he never pointed the finger at anyone else. Okay, so there's nothing really in the record that explains it. No, he took the blame. He said that it was a misreference. He cited his, referenced his communications with Cecilia, the desirer. He referenced his letters that he'd sent her that were consistent with the construction agreement he prepared after she died, and then consistent with his affidavit and deposition testimony at the end. But all of which, and I know I've made some argument in my brief here too about the construction, and I'm sorry if I've gone over my, my. We've asked you a lot of questions. All right, sorry. He went over it too. Yeah. It's getting to be popular. Yeah. Two more minutes, two more minutes, please. Thank you. Go ahead. Ultimately, the point about misgivings there, we made reference to Welch, we made reference to the document, whether it's ambiguous or unambiguous. I think if we look at the document as a whole, the trial court was able to review it and say, if we review it under their analysis, it doesn't lay with Article 4, which is the very article captioned Child's Trust and about the distribution of the child's trust. In addition to that, Welch's testimony is consistent with what his interpretation was based on Cecilia's intent as conveyed to him during their conversations. In addition, I just want to address these just at the very end here. Relating to the trustee and the de facto trustee, we talked about the grantor's ability to appoint a trustee, and that's where the trustee position comes from. What they've attempted to do is to make Camille a trustee, even though under either of the documents she could not have been served and was prevented from serving. It doesn't mean that Camille is insulated at all from any liabilities. They try to say that our position would reflect. It would just mean that Camille would have some responsibility if for some reason she mismanaged assets as she held them. I mean, she's preserved them since her mom passed away, because whether or not she tried to appoint a trustee, the construction agreement couldn't be signed and doesn't agree to. So she's kind of where she's been as the case has progressed. But to the extent that she would have mismanaged, if she would have somehow lost something, mismanaged, done anything with the assets, could there be a rat of action? Possibly. But that's not what has been proven here through any facts or proof so far, through summary judgment. It's clear that what Camille received and what Camille has has been set out in all the records that have been provided and conveyed through discovery, through all the information that's been provided in this case. In sum, Your Honors, we respectfully request that the court affirm the judgment from the trial court on all six counts of the, or excuse me, all nine counts of the Third Amendment complaint, finding summary judgment in our client's favor. Thank you. Thank you, Counselor. May it please the Court, I will now address briefly some of the points brought up by Counsel, and then I will reference a few of the points made in the trial court's determination from the transcript. You have three minutes. Thank you, Your Honor. At the time that motion for summary judgment had been filed, the issues of the Third Amendment complaint had just been joined. It was filed before a status date on the general discovery in the matter was to proceed. The only deadlines in terms of discovery that were imposed were 191B, because at that point that was the only discovery that we could proceed with, was 191B, once a motion for summary judgment has been filed. We properly examined the affiant. We properly sought to examine affiants not in our control. The trial court then states that the affidavit does not consider it because, quote, that after the deadlines have passed, a letter or a report from the doctor, not an affidavit, a letter or a report from the doctor is subsequently produced, but the court finds that that's a violation of the rules, and the court will not consider and does not consider that document and that doctor's report or the contents thereof. It is not a report. It is a duly sworn affidavit. In the affidavit itself, it quotes Amber Atkins' report. It points out which report she relied upon. The conclusions drawn from that are the same conclusions an expert would draw at trial. The opinions given in this affidavit are to a reasonable degree of medical and psychiatric certainty. It lists its qualifications. There is nothing improper – there's no impropriety in the affidavit as counsel would suggest. Additionally, that letter was – I'm sorry. I will – I apologize. I don't know. I will ask for more time for you, but I would like to know, do you disagree that there was a 213 inquiry to you that was pending that asked for any experts you had that you did not answer fully? Your Honor, there is no 213F3 disclosure deadline, which would be proper as you approach trial. At that time, there was a 213 inquiry. Right. And you responded at the time, which was not intent – we did not have Dr. Patras as an affidavit at the time that we responded to that. We decided – And you supplemented when you did get Dr. Patras? The supplement was the affidavit being filed, which is proper. It's timely at the time of that hearing. There was no – the disclosure was everything that would have been disclosed in a disclosure. The reason Dr. Patras' affidavit was necessary was during the deposition of Camille Calkins, which was conducted for the first time pursuant to 191B. Counsel went on about how long the case has been at issue – how long the case has been filed. And to answer one of your questions, the reason that a petition to open probate was filed by us was because counsel – We filed letters to collect. We issued citations to discover assets against Camille because we believed that there were assets in the estate. No one was ever admitted to probate. So throughout that entire time, they delayed the deposition of Camille until such time as the very end of that 191B window, at which point she was deposed and for the first time stated, my mother never had dementia. And that's when you had to get an affidavit. Correct. And it was disclosed properly at the time of response to summary judgment and cross-motion. Okay. On counsel's behalf, may he take two minutes now since I took most of his two minutes. I'll take silence as acceptance. Thank you, Your Honor. Counsel would also have you believe that Camille has simply preserved estate assets since her mother's death. When, in fact, prior to her mother's death, while she was admitted to a memory care facility during her life, Camille listed herself as trustee on all the accounts, had checks written that said Camille Calkins, trustee of these trusts, signed it as a trustee, understood what being a trustee meant. The trial court ended its inquiry on undue influence on breach of fiduciary duty and on the other matters before the court at whether or not a fiduciary relationship exists. There's no question that in law and in fact a fiduciary relationship existed. The actions were never examined. The Atkins report was never challenged until here today on foundational grounds. Counsel included it in their own motion. The court did, in fact, consider it and said the only issue was proximity, stating Dr. Atkins, who is a psychologist, found her to have dementia. However, there's nothing in the record that the court can properly consider as being before it that relates any of those symptoms back to the time of the execution of the trust documents. No motion was ever filed to exclude it. No was a motion to exclude the affidavit, to strike it, or to bar the testimony of Dr. Patches, which would have been proper. Counsel had the opportunity to conduct their own 191B discovery. The court ruled 191B was violated. No discovery deadline of disclosures had ever been imposed. The Patches affidavit stands unrefuted in the record. No medical testimony has ever been provided. No medical records have ever been provided. Nothing that would say Cecilia had capacity at the time she executed those documents. As such, her capacity is a genuine question of material fact that undercuts all of the counts. It undercuts the counts for under influence because that is one consideration. It undercuts the construction counts because what would have been known to her, ostensibly, Welch showed her the agreement for the first time in person on the date that she was before him, the restatement, in 2007 when she was before him. What about the accounting counts? The accounting counts, Your Honor, are also for an accounting of why assets of the estate were not distributed to the proper parties upon the mother's death. Ronald, any power of appointment is not before this court. The will does, in fact, have to be admitted. The Hicks Court states, without a will being admitted to probate, a will will not be admitted for purposes of evidence of its purported contents, meaning the power of appointment was never properly lodged. The reason that the accounting counts are in is because at the mother's death, Camille was acting as a trustee under both of those trusts who had been a named co-trustee She had concealed that fact from Ronald, who should have been acting as a co-trustee on the mother's incapacity. She had concealed that fact. Upon the mother's death, as the acting trustee, whether or not she was barred from it does not change the fact that that's how she was acting. She should have distributed one half of the residue to Ronald, and that is part of an accounting count because she has to account for the sums that were or were not properly distributed. This may be a difference that is important, but I know she signed things like TEE or something like that. TTE. TTE. But didn't she have the right to do that under the power of attorney? Not as a trustee. Shut up! But I mean to do the same act. Correct, but the court determined that she never had a fiduciary role, which is contrary to all the facts in the record. Nothing has refuted that. In that same instance, it wasn't just that she signed it. She had checks made that said trustee on them of those trusts. Those accounts listed her as a trustee, and yet in her pleadings and the court's determination, she never acted as a trustee because she couldn't. But that presupposes that she couldn't just because it says it doesn't, just as if a speed limit means no one has ever sped. So I would conclude by stating that there are genuine issues of material fact as concerned the capacity of Cecilia, which undercut every single account and which would necessitate reversal of the trial court's determination. I would say that there's issues of material fact concerning the involvement of Camille that a trial court should have weighed and considered, which the trial court instead did themselves. And there are issues of material fact as to the reading of that, the trust document, and whether it's even comprehensible. To underline all of that is the improper non-consideration of the Patras properly filed, duly sworn affidavit. Thank you. I thank this court for its time, and I appreciate your patience in waiting through so many. Thank you, counsel. We will take the mail, however.